**EXHIBIT A**

```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS
 2

 3     ZURICH AMERICAN INSURANCE            )
       COMPANY,                             )
 4                                          )
                      Plaintiff             )
 5                                          )  CA No. 21-11621-PBS
             -VS-                           )  Pages 1 - 59
 6                                          )
       MEDICAL PROPERTIES TRUST, INC.,      )
 7                                          )
                      Defendant             )
 8
             -and-
 9
       STEWARD HEALTH CARE SYSTEM, LLC,     )
10                                          )
                      Plaintiff             )
11                                          )  CA No. 21-11902-PBS
             -VS-                           )
12                                          )
       AMERICAN GUARANTEE AND LIABILITY     )
13     INSURANCE COMPANY, et al,            )
                                            )
14                    Defendants            )
```

15
                          **MOTION HEARING**

16
                  BEFORE THE HONORABLE PATTI B. SARIS
17                   UNITED STATES DISTRICT JUDGE

18

19                              United States District Court
                                1 Courthouse Way, Courtroom 19
20                              Boston, Massachusetts  02210
                                August 10, 2022, 2:37 p.m.
21

22

23                         LEE A. MARZILLI
                        OFFICIAL COURT REPORTER
24                   United States District Court
                     1 Courthouse Way, Room 7200
25                        Boston, MA  02210
                         leemarz@aol.com

1   A P P E A R A N C E S:

2        MICHAEL MENAPACE, ESQ., Wiggin & Dana LLP,
    20 Church Street, Hartford, Connecticut, 06103,
3   for Zurich American Insurance Company.

4        MARTIN C. PENTZ, ESQ., CREIGHTON K. PAGE, ESQ.,
    and NATALIE F. PANARIELLO, ESQ., Foley Hoag LLP,
5   155 Seaport Boulevard, Seaport World Trade Center West, Boston,
    Massachusetts, 02210, for Medical Properties Trust, Inc.

6
         DALE JEFFERSON, ESQ., Martin, Disiere, Jefferson & Wisdom
7   LLP, 808 Travis Street, Suite 1100, Houston, Texas, 77002,
    for Medical Properties Trust, Inc.

8
         HOWARD M. COOPER, ESQ., Todd & Weld,
9   One Federal Street, 27th Floor, Boston, Massachusetts, 02110,
    for Steward Health Care System, LLC.

10
         JONATHAN D. MUTCH, ESQ., Robins Kaplan LLP,
11  800 Boylston Street, Suite 2500, Boston, Massachusetts, 02199,
    for American Guarantee and Liability Insurance Company.

12
    ALSO PRESENT:  Kathryn Frost
13

14

15

16

17

18

19

20

21

22

23

24

25

P R O C E E D I N G S

THE CLERK:  Court calls Civil Action 21-11621, Zurich American Insurance Company v. Medical Properties Trust.  Could counsel please identify themselves.

MR. MENAPACE:  Thank you, yes.  Michael Menapace of the law firm Wiggin & Dana for Zurich and in the companion case for American Guarantee.

THE COURT:  Okay.

MR. MUTCH:  I'm Jonathan Mutch from Robins Kaplan for American Guarantee, and with us today is Katherine Frost for Zurich.

THE COURT:  Well, let me just ask, is only one of you going to argue?

MR. MENAPACE:  Yes.

THE COURT:  For all motions?

MR. MENAPACE:  Yes, your Honor.

THE COURT:  I mean, from that point of view.  All right, thank you.

MR. PENTZ:  Good afternoon, your Honor.  For Medical Properties Trust, Marty Pentz, Foley Hoag, and my colleagues Creighton Page and Natalie Panariello, and behind us Dale Jefferson from Martin, Disiere, Jefferson & Wisdom in Houston, also for Medical Properties Trust.  And I think you know this gentleman.

THE COURT:  Yes, I do.

```
 1              MR. COOPER:  Hello, your Honor.

 2              THE COURT:  Hello.

 3              MR. COOPER:  Howard Cooper for Steward Health --

 4              THE COURT:  Actually, I'm not sure I recognize you.

 5              MR. COOPER:  Much more gray, I'm sure.

 6              THE COURT:  Who's going to argue for your side?

 7              MR. PAGE:  I am, your Honor.

 8              THE COURT:  And I'm sorry, because I had heard so many

 9       names, you are again?

02:38 10              MR. PAGE:  It's Creighton Page.

11              MR. COOPER:  Your Honor, if I may, I would like to

12       just reserve two minutes in the event that Mr. Page doesn't

13       cover something that I want to cover.

14              THE COURT:  Sure.  It's a little confusing here

15       because I think there are cross-motions and multiple parties.

16       Have you discussed a possible order?  I mean, it's really, at

17       the end of the day, one narrow legal issue.

18              MR. MENAPACE:  It is the same issue, your Honor, in

19       both cases.  We assumed that since the MPT case, Zurich v. MPT

02:39 20       is the first docket number, that we were going to proceed with

21       that motion.

22              THE COURT:  Okay.  And you're both moving parties,

23       right?  You're all moving parties.  I confess I didn't read

24       everybody's brief.  I read one set of briefs.  So if there's

25       something unique to your case, you'd better tell me about it.
```

1          All right, why don't you start there, Mr. Menapace.

2          MR. MENAPACE:  Thank you, your Honor.  In a few

3     minutes, my brother is going to ask you not to apply the

4     holding of the First Circuit case *Fidelity v. Nova*.  He's going

5     to try to justify that request, your Honor, by explaining that

6     the Mass. SJC cases that the First Circuit cites in *Fidelity*

7     have different facts than this case.  That's the *Boazova* case

8     and the *Surabian* case.

9          Of course, the *Fidelity* case from the First Circuit

02:40 10    does have the same facts that are present here, and there's no

11    reason why the law established by the Mass. SJC cannot be

12    applied in cases with the variation on the facts that were

13    presented there.  MPT disagrees with the First Circuit, we

14    understand that, but that's not a reason for this Court to set

15    aside the precedent.

16         A ruling from the Mass. SJC doesn't have to be decided

17    on the same facts in a subsequent case to be precedential.  It

18    establishes the law of Massachusetts, and courts are bound to

19    apply that law in cases with variations on the facts.  Moreover,

02:40 20    there is no indication from any of those three cases, from

21    *Fidelity*, *Boazova*, or *Surabian*, that their holdings were

22    confined specifically to the facts presented.

23         The First Circuit of course has said, "If lower courts

24    felt free to limit Supreme Court opinions precisely to the

25    facts of each case, then our system of jurisprudence would be

1    in shambles."

2         I'm not going to linger on the facts, the underlying

3    facts.  I'm going to presume the Court has read the facts.  I'm

4    happy to circle back if the Court has specific questions on the

5    facts, but basically there was a massive rain event two years

6    ago June.  Water pooled on the roof of the hospital buildings

7    when the drains couldn't accommodate the amount of water that

8    had inundated the roof, and water entered the hospital, both

9    from that inundation and also from the ground into the first

02:41 10   floor and the basement.

11         The sole issue before the Court today, in both cases,

12   is whether damage caused to the Norwood Hospital, by water

13   accumulation on and infiltration through the roof, falls within

14   the property sub-limit for a flood.  There are some ancillary

15   issues between the parties, your Honor.  Zurich has already

16   paid out tens of millions of dollars on the claim.  However,

17   with the legal ruling on the sub-limit, your Honor, we submit

18   that many of those other issues are going to be resolved

19   between the parties.

02:42 20        THE COURT:  Well, one question I had is, as I

21   understand, the sub-limit is $100 million?

22        MR. MENAPACE:  In the MPT policy, it's $100 million.

23   In the other policy, it's $150 million.

24        THE COURT:  All right, so was the damage so extensive

25   that this case is going to be more than, what is it,

1    $250 million?

2         MR. MENAPACE:  We don't know yet.  They just started

3    the rebuilding process.

4         THE COURT:  That's a huge amount of money.

5         MR. MENAPACE:  It is a large amount of money, your

6    Honor, which is why --

7         THE COURT:  I was wondering why I was doing this

8    fascinating esoteric exercise on the meaning of "flood" if the

9    damages were going to be lower.  What did you say?  So they're

02:43 10   going to get, under any theory, $250 million?

11         MR. MENAPACE:  Just on the business interruption

12    claims already, we've paid out more than $100 million, and they

13    haven't started the rebuilding yet.

14         THE COURT:  I'm just saying, like, even if I rule your

15    way, how much money do they get?

16         MR. MENAPACE:  At most, they get the $100 million.

17    MPT is entitled to $100 million at most.  They own the

18    building.  They had to renovate.  In fact, they chose to

19    rebuild the building.

02:43 20        THE COURT:  All right, so your position is $100 million,

21    and their position is $200 million?

22         MR. MENAPACE:  Their position is -- I believe the

23    policy limits on that are $250 million.

24         THE COURT:  If I don't do the sub-limit?

25         MR. MENAPACE:  Without the sub-limit.  Just with the

```
 1    sub-limit, it's $100 million, your Honor.

 2              THE COURT:  And you've already paid that out?

 3              MR. MENAPACE:  Under the two policies.  So let me step

 4    back.

 5              THE COURT:  I mean, I just want to understand how much

 6    money is going to --

 7              MR. COOPER:  Your Honor, may I?

 8              THE COURT:  Yes.

 9              MR. COOPER:  There are separate policies, one for MPT

10    and one for my client, Steward.  My client's claim submitted to

11    date in round numbers is $220 million.  So the $150 million

12    sub-limit, that alone, there is a delta of $70 million that we

13    would be fighting over.  I can tell you, your Honor, I don't

14    know if you're familiar with Norwood Hospital --

15              THE COURT:  No.

16              MR. COOPER:  -- but we're talking about six separate

17    structures on this campus and a devastating flood event.

18              THE COURT:  Wait a minute.  Six separate?  I see a

19    picture of one structure.

20              MR. COOPER:  Okay, well, we're going to use one as an

21    example, but this is a 215-bed acute-care medical facility.

22              THE COURT:  So I just want to understand a basic thing

23    here.  So we already know it's going to go over the sub-limit,

24    so this is not something that's --

25              MR. COOPER:  There is potentially a shortage in my
```

1    client's claim, if the sub-limit were to be applied, of what's

2    been identified to date, with the business interruption still

3    ongoing, of a $220 million claim.  So there is $70 million

4    dollars if the sub-limit applies that my client --

5            THE COURT:  Your client is Steward?

6            MR. COOPER:  My client is Steward.  The number is

7    slightly different with MPT.  They have their own claim that

8    Mr. Page will explain.

9            MR. PAGE:  I actually didn't realize that the Steward

02:45 10    claim was for $220 million, which happens to be very similar to

11    what the total claim for MPT is, but these are different kinds

12    of losses, your Honor.

13            THE COURT:  So I just want to make sure.  All I'm

14    deciding today, as I understand it, is whether or not this

15    qualifies under the flood sub-limit?

16            MR. MENAPACE:  That is the sole issue before the

17    Court.

18            THE COURT:  And are there other issues, or is this

19    just step one in a very long and ugly situation?

02:45 20            MR. MENAPACE:  Our position is, when the Court makes a

21    ruling as a matter of law on this issue, the other ancillary

22    issues, I don't think we're going to be that far apart, and the

23    parties may be able to resolve them.  This is the major issue,

24    which is why we asked the Court to take the early summary

25    judgment motion before we engaged in full discovery and experts

```
 1    and all of that.
 2              MR. COOPER:  With all due respect, your Honor, that's
 3    not correct.  Among other things, my client, which is a
 4    healthcare facility, which alerted Mr. Mutch's client, which is
 5    AGLIC, American Guarantee and Liability Insurance Company,
 6    which they're represented by the same counsel and they're
 7    affiliated, that a healthcare facility needed to be rebuilt,
 8    with time being of the essence.  And we are now two-plus years
 9    into this, and my client's lawsuit in which we're the plaintiff
02:46 10  includes bad-faith claims, so this is not going to resolve the
11    issues in the case.  Governor Baker, when this devastating
12    event happened --
13              THE COURT:  Yes, I know.  All right, I don't need the
14    whole speech.  So the bottom line is, this does not resolve the
15    whole lawsuit.  There's a very narrow issue, it's just a
16    preliminary issue, and, yes, it will go over the limits.  It
17    sounded like a lot of money to me, but you're telling me that
18    at least so far, it has already gone over the limit.
19              MR. MENAPACE:  The losses submitted to date have gone
02:47 20  over the limits, your Honor.
21              THE COURT:  Okay, that's useful to know.
22              MR. MENAPACE:  So we have to start with the flood
23    limit and the definition of "flood."  It is defined in the
24    policy.  "Flood" is defined as "a general or temporary
25    condition of partial or complete inundation of normally dry
```

1    land or structures caused by the unusual and rapid accumulation

2    or runoff of surface waters."

3          "Surface water" is not defined in the policy, and

4    under Massachusetts law, it is afforded its ordinary and plain

5    meaning.

6          So the inquiry here must start with the First Circuit

7    ruling on the issue in *Fidelity* because it dealt with a

8    similarly worded policy and similar facts, flood on a roof with

9    parapet sides.  So the Court is not starting the inquiry with a

02:48 10    blank canvas.

11          The *Fidelity* court, the First Circuit, held that water

12    accumulating and inundating on a roof after a severe rainstorm

13    was surface water within the definition of a flood in a

14    property insurance policy; and, in doing so, the First Circuit

15    explained that a roof may be considered dry-land area under a

16    standard technical definition of "land" because the definition

17    includes not only soil but everything attached to it, whether

18    attached by the course of nature, such as trees, herbage, or

19    water, or by human hands, as buildings, fixtures, and

02:49 20    fences.  This is logical because if we exclude artificial

21    surfaces from the scope of surface water, it would render vast

22    swarths of the world without a surface, based on the presence

23    of a building or pavement.

24          And the First Circuit didn't make up this rule.  It

25    was not the first one to plow this ground.  It applied standard

contract interpretation principles, and, of course, it applied
*Boazova* and *Surabian* from the Mass. SJC, even though those
cases involved surfaces, man-made surfaces that were close to
or on the ground.

The *Fidelity* court holding is binding here.  There is
no indication from the First Circuit or the Mass. SJC that any
slight variation on the height of those man-made surfaces would
have resulted in a different holding.

So I've mentioned *Surabian* and *Boazova* a couple of
times.  *Surabian* involved a parking lot, paved parking lot.
Heavy rain fell on it.  It could not flow into the drains
adequately, and the court was looking at a policy exclusion for
flood or surface water.  The court held that water accumulating
on a paved surface, such as a parking lot, retains its
characteristic as surface water.

The same day the Mass. SJC also issued the decision in
*Boazova*.  In that case, it was a concrete patio outside of a
house that was above the foundation line of the house.  Rain or
snow would fall on the patio, and the water would find its way
into the home.  There was a policy exclusion for flood --

THE COURT:  How high up was that patio?

MR. MENAPACE:  Well, the patio was resting on top of
the ground at the back of the house above the foundation, so it
was resting on the ground, the patio.

THE COURT:  Like a couple of inches?

1          MR. MENAPACE:  Yeah, I don't remember the size, 2, 3,

2    6 inches of patio.

3          THE COURT:  All right, but not --

4          MR. MENAPACE:  It was not a roof, no.

5          THE COURT:  And it was not an elevated patio?

6          MR. MENAPACE:  At that point, no.  The front of the

7    house was lower, but there it was sitting on the ground.

8          The court found that the fact that the water ran

9    across the patio, not on the dirt or the ground, didn't change

02:51 10   the essential character of the surface water.  And it cited a

11   Texas Appellate Court case, the *Crocker* case, where water

12   accumulated on a patio that was a foot above the soil.

13         THE COURT:  So the First Circuit has ruled on a roof.

14         MR. MENAPACE:  Yes.

15         THE COURT:  But the SJC has ruled primarily on much

16   lower structures?

17         MR. MENAPACE:  The facts of those cases had lower

18   structures.  There is nothing --

19         THE COURT:  I mean, we looked it up in Couch on

02:51 20   Insurance as a treatise, which basically says there's a split

21   in the jurisdictions on the issue.

22         MR. MENAPACE:  Knowing the -- I would respectfully

23   disagree on a split.  We have cited the cases --

24         THE COURT:  I mean, just different cases, courts have

25   come out different ways.  And, by the way, Couch puts the First

1    Circuit in the column of saying that roof water surface water

2    exists --

3            MR. MENAPACE:  Yes, your Honor.

4            THE COURT:  -- but there were cases in other

5    jurisdictions that came out otherwise.  Is there a standard

6    definition of "surface water" anywhere in the insurance, I

7    don't know, best practices or insurance world?

8            MR. MENAPACE:  It is not a defined term, your Honor,

9    which is why the courts have said we apply its ordinary and

02:52 10   plain meaning.

11           THE COURT:  You know, even I have had several roof

12   cases.  So I'm just curious as to why the insurance companies

13   have never actually, given the amount of litigation in the area

14   and a split --

15           MR. MENAPACE:  Well, here the law is set, your Honor.

16   We know what surface water means here in the First Circuit and

17   in Massachusetts because the First Circuit has said so.  So we

18   have these standardized policies, and the law is that water

19   falling on the roof, a flat roof, even with parapet sides, is

02:53 20   surface water.

21           It's also worth noting, though, that the Mass. SJC

22   cases, your Honor, were even interpreting surface water

23   narrowly because it was in the context of an exclusion.  And as

24   you just pointed out, Massachusetts is not alone in that water

25   ponding on a roof is surface water.  As far back as a hundred

1    years ago, in 1924 the Delaware Chancery Court held, "In the

2    case of a building erected on land, the roof is to be regarded

3    as artificial elevation of the earth's surface.  When it

4    intercepts the falling rain or snow, it therefore gathers

5    surface water."

6          Of course, much more recently, we cited the case from

7    the Northern District of Ohio.  That's the *Oak Hill* case.  It

8    said, "Surface water retains it character on a roof on which a

9    man could walk or an object could rest."  The Virginia District

02:53 10   Court in *Danville* said, "The majority of courts that have

11   addressed this question have concluded that surface water

12   includes water on a roof."  The Colorado Appellate Court --

13         THE COURT:  All right, you listed them in your brief.

14         MR. MENAPACE:  Yes, and so DC, Michigan --

15         THE COURT:  Are there any other circuits that have

16   ruled one way or another, because the two that we found were

17   unreported cases, the Sixth and the maybe Eleventh?

18         MR. MENAPACE:  That sounds right to me, your Honor.

19         THE COURT:  But they were unreported, Federal

02:54 20   Appendix, right?

21         MR. MENAPACE:  Yes.

22         THE COURT:  So the First Circuit is the only published

23   decision?

24         MR. MENAPACE:  That I know of from an --

25         THE COURT:  Appellate court?

1          MR. MENAPACE:  -- appellate court, your Honor, yes, a

2     Federal Appellate Court.

3          THE COURT:  Yes.  Are there any Supreme Courts of

4     states that have come out another way rather than lower courts?

5          MR. MENAPACE:  We have the Texas Court of Appeals and

6     the Colorado Court of Appeals, your Honor.

7          THE COURT:  And those are the top courts of those

8     states?

9          MR. MENAPACE:  Yes, your Honor.  No, they are not the

02:54 10    top courts of the states.  Those are immediate appellate

11    courts, your Honor.

12          THE COURT:  And they've come out --

13          MR. MENAPACE:  That water on the roof is surface

14    water.

15          THE COURT:  So the appellate cases that exist come out

16    your way.  Do any come out the other way, appellate courts?

17          MR. MENAPACE:  I'm not aware of that, your Honor.

18          MR. PAGE:  The answer is "yes," your Honor.

19          THE COURT:  Well, I know you both cited, you know,

02:55 20    several cases.  I know there's been disagreement on it.

21          All right, go ahead.

22          MR. MENAPACE:  The point of these cases, your Honor,

23    the First Circuit holding in *Fidelity* is not made up out of

24    thin air.  It's based on Mass. SJC law and the majority of

25    courts that have addressed this issue.

1      Of course, we're not confined to just looking at the

2   case law, your Honor.  We have to look at the policy, and

3   there's other textual evidence in the policy itself that

4   surface and ground are treated differently.

5      In the "flood" definition, the definition uses the

6   term "surface water" in one subsection, and then right below it

7   in the next subsection, your Honor, the policy uses the term

8   "ground" in a different way.  The policy covers damage from

9   mudslides due to the accumulation of water on or under the

02:55 10   ground.

11      THE COURT:  What section are we looking at?

12      MR. MENAPACE:  This is Policy Section 7.23.  It was

13   attached to our briefing as Exhibit A, and we labeled it A-68.

14      THE COURT:  Okay, all right, so 7.23.

15      MR. MENAPACE:  7.23.  In 7.23.01, the policy uses the

16   term "surface water."  In the very next subsection, it uses the

17   term "ground" differently, for water that accumulates on or

18   under the ground.  This is for mudslides.  The policy can't be

19   interpreted to have those two terms always mean the same thing.

02:56 20   They have to be given different definitions.

21      So we have the case law and we have the policy itself

22   with textual evidence that surface water does not mean, as MPT

23   submits, the same thing as grounding.

24      In opposition, MPT makes three major arguments, your

25   Honor, and I'd like to touch on each one of them briefly.  The

1    first one is that surface water must be at ground level.  Two,

2    that water on the hospital roof did not spread naturally, and

3    the roof is therefore a water channel like a river or a trench,

4    so the flood limit doesn't apply.  And then, thirdly, they

5    argue the Court does not have to apply *Fidelity v. Nova* because

6    it's not precedent.

7         As to the first one, that surface water must be at

8    ground level, MPT cites no authority from the Mass. SJC that

9    the height of the structure involved has to be a certain level

02:57 10   above the ground or in the ground to qualify or not as a flood.

11   Of course, the First Circuit has applied that, that water on

12   the parapet roof was surface water.

13        If we go back to *Boazova* -- that's the concrete patio

14   above the foundation -- there was an artificial surface, the

15   concrete structure, that was above the foundation and sitting

16   on top of dirt.  The Mass. SJC never used the phrase

17   "ground level" the same as "surface" in that case, "surface

18   water."  And, importantly, the decision doesn't suggest a

19   different outcome if the patio were a foot, 5 feet, 10 feet

02:58 20   above the ground.

21        So let's imagine a 6-inch patio that's on the ground.

22   Everyone agrees that water on that patio would be surface

23   water.  There's no dispute there.  Well, what if it's a foot?

24   Why does it lose its characteristic as surface?  Five feet,

25   10 feet, 20 feet, why does it matter if it's a slab of concrete

1     that's 20 feet in surface water or the top of a building?

2     There is no reason to draw an artificial line like that under

3     the Mass. SJC case law or the First Circuit.  The First Circuit

4     did not seem bothered at all that it was applying the law from

5     the Mass. SJC in these cases to the factual scenario in *Fidelity*,

6     which involved the roof.

7              THE COURT:  By the way, what's a parapet roof?

8              MR. MENAPACE:  A parapet roof is, if you can imagine a

9     flat roof, it has small sides around it.  In the old days, the

02:59 10     archers used to stand between the parapets and --

11              THE COURT:  Like in a castle?

12              MR. MENAPACE:  I'm sorry?

13              THE COURT:  Like, you mean the wall around the roof?

14              MR. MENAPACE:  Yes.

15              THE COURT:  Without the slats or the --

16              MR. MENAPACE:  In this case, it did not have slats.

17     It can have slats.

18              THE COURT:  -- or without the boiling water --

19              MR. MENAPACE:  Yes.

02:59 20              THE COURT:  All right.  I'm told boiling pig's blood,

21     I recently learned, so not to get too graphic.

22              MR. MENAPACE:  I confess, I was not aware of that,

23     your Honor.

24              THE COURT:  All right.  All right, go ahead.

25              MR. MENAPACE:  So, secondly, MPT argues that the rain

1    on the roof did not qualify as surface water because it wasn't

2    naturally spreading and diffusing on the ground without

3    following a defined course or channel.  For this argument, MPT

4    is relying on the *Martinez* case from the Colorado Court of

5    Appeals, and in that Colorado case, the water fell on the roof,

6    and it was deemed surface water.

7         The court then considered whether that water lost its

8    characteristic of surface water when it fell off the roof and

9    into window wells next to the building.  *Martinez* defined that

03:00 10   water course or water channel has to have three requirements:

11   It has to have the primary purpose of diverting water; it has

12   to intentionally prevent percolation, evaporation, or drainage;

13   and it has banks at the edges giving it a defined course of

14   channel, some definiteness or permanence.

15        So even if the Colorado court decision controlled this

16   case, which of course it doesn't, MPT's argument still fails

17   under that test.  First, we have to remember that *Martinez*, the

18   Colorado court, found that the water on the roof was surface

19   water.  It then found that the water in the window wells

03:01 20   retained its characteristic as surface water.

21        And just like the primary purpose of those window

22   wells was not to divert water, it cannot be said that the

23   primary purpose of the hospital's roof was to divert water.

24   Roofs serve lots of purposes.  They keep out wildlife.  Today

25   they keep in cool air, in the winter hot air.  They provide

1   structural stability, et cetera.  Likewise, the roofs in the

2   hospital buildings are not in place intentionally to prevent

3   evaporation.  Given enough time, water on the roof will

4   evaporate.  You can imagine a scenario on this flat roof where

5   it rains and a puddle forms on the --

6          THE COURT:  I've lost you here.  So *Martinez* says that

7   it has to -- please restate that.

8          MR. MENAPACE:  Yes, so *Martinez* says, for water to

9   lose its characteristic as surface water, it has to meet these

03:02 10   three characteristics.  And here the water, that's not the

11   case.  They don't meet the test here, okay?  A little bit of

12   water pools on the roof, and the cant of the roof is not enough

13   that the water reaches the drain.  It's going to evaporate.

14          And, two, the main purpose of the roof, it can't be

15   said the primary purpose is to channel water like a river or a

16   trench, something designed for flood.  In fact, most of the

17   cases that find that water has lost its characteristic of

18   surface water have done so because the water reaches something

19   designed to accommodate floods, flood prevention, a stream.  I

03:02 20   think one of the cases we cited was a trench that was dug to

21   move the water.  That's not what the roof does here.

22          This case is more like the Virginia case, the *Danville*

23   *v. Selective* case, where water pond on the roof, and the court

24   said surface includes more than just the ground.  In that case,

25   it was the roof of a warehouse.

1          In contrast, your Honor --

2          THE COURT:  We just need to move this along.  So then

3     the third issue is whether it's precedential or not?

4          MR. MENAPACE:  Yes.  I was just going to say, unlike

5     here, if the water had actually reached inside the drain or in

6     a gutter, it could be considered a channel at that point, but

7     not while it's on the roof, your Honor.

8          Third, *Fidelity* being non-precedential dicta.  MPT

9     argues that the discussion of water on the roof in *Fidelity*

03:03 10   coming within the meaning of surface water is irrelevant

11    because the parties in the suit didn't contest whether the

12    ponded water was surface water, and they said that the court

13    overlooked the requirement that the surface water be naturally

14    flowing on the ground because in that suit, *Nova*, the policy

15    said water from any source.  Whereas here, MPT argues that the

16    flood definition only talked about water coming from the ground

17    level.  Well, that's not true, your Honor.  The policy here

18    imagines scenarios where the water comes from above, rain from

19    a named storm.

03:04 20        THE COURT:  Where?  Where?  I'm looking at the policy.

21         MR. MENAPACE:  Sure.  The "named storm" provision,

22    your Honor, is -- it's actually not part of the definition, but

23    there is a section of the policy that covers damages from a

24    named storm, including from rain.  It's just not applicable in

25    this case, but the policy does accommodate situations where

1    water coming from above is covered.

2         The policy covers, of course, water on the ground, and

3    the policy imagines scenarios where the water is under the

4    ground, such as in the mudslide provision.  So there's no

5    indication that the -- the policy just simply is not confined

6    to only situations where water is emanating at ground level.

7         Not only did the First Circuit quote the policy and

8    the case law, this is not a situation where this was a flippant

9    decision by the First Circuit.  They quoted it.  They analyzed

03:05 10  it.  They applied it to the facts of the cases.  They applied

11   it to the facts of a case by referring back to the beginning of

12   the decision, and they came to a holding which was one sentence

13   long at the end.  It was a conclusion.  That does not make it

14   dicta.

15        I understand that MPT now in hindsight, if they were

16   there, would have argued it differently and maybe put more

17   emphasis on certain things, but that does not mean that the

18   First Circuit did not consider these issues.  They did consider

19   these issues, and they rejected them.

03:06 20       Finally, just two other small points, your Honor.  MPT

21   argues there is no flood limit because the top floors of the

22   hospital were not inundated with water.  They're misreading the

23   policy.  The inside of the building does not have to be

24   inundated.  The normally dry surface -- in other words, the

25   roof -- has to be inundated.  That argument does not --

1          THE COURT:  It looks as if the insurance company

2    changed its mind.  It originally had thought that there were

3    two separate provisions covering it and then decided, no, both

4    of them were floods.

5          MR. MENAPACE:  So initially when MPT and Steward filed

6    their notice of loss a few weeks later -- I think it was just

7    three weeks -- the claims adjuster said, you know, "We're going

8    to be looking into this.  We need more information, and right

9    now we'd like to see the information that appears X, Y and Z."

03:07 10    He was gathering facts.  This was not a coverage position, your

11    Honor.

12          Moreover, there's nothing in the briefs here, your

13    Honor, of a waiver or an estoppel argument.  If they want to

14    argue that, that's not for today.  It hasn't been briefed; it's

15    not before the Court.  But the bottom line is, that was not

16    Zurich's position.  It was a fact-gathering initial letter.

17    Several months later, once Zurich got the information on what

18    happened, they put forth their official coverage position.

19          And then the last thing, your Honor, is that MPT seems

03:07 20    to kind of get itself twisted all in knots about this cause and

21    effect, and they claim that Zurich is arguing the flood is both

22    the cause and effect, and therefore they don't meet the

23    definition.  Let me be real clear:  The cause here was the

24    inability of the roof drains to accept the massive amount of

25    water on the roof.  The effect of the inability was then the

1    complete inundation of the normally dry structure, the roof.

2              And on the last little bit, MPT asks in the

3    alternative to certify this to the Mass. SJC.  We think that's

4    inappropriate, your Honor.  Every time there's a new factual

5    scenario on a breach of contract case, we don't certify it to

6    the Mass. SJC.  And in fact here we don't have a new factual

7    scenario; it's the same as *Fidelity* v. *Nova*.

8              THE COURT:  Thank you.

9              MR. MENAPACE:  So unless the Court has any questions,

03:08 10   I'll rest.  Thank you.

11             THE COURT:  Thank you.

12             So who's arguing again?

13             MR. PENTZ:  Mr. Page.

14             THE COURT:  Mr. Pace, right?

15             MR. PENTZ:  Page.

16             THE COURT:  Page.

17             MR. PAGE:  Page, yes, like page in a book.

18             Let me start, your Honor, with a couple of things that

19   I heard from my brother, Mr. Menapace, with which I absolutely

03:08 20  agree, okay.  Number one, the SJC precedent on the meaning of

21   "surface waters" one hundred percent controls here.  The words

22   that the SJC chose to define the term "surface waters," which,

23   as we have heard, is not defined in the policy, so that means

24   that the words that the SJC has chosen to define "surface

25   waters" control the meaning of that term for purposes of our

1   policy.  The SJC has defined that words "surface waters" on at

2   least three separate occasions, including twice in the last

3   decade in insurance cases.  It has used the exact same words

4   every single time to define this term.

5          So when your Honor asked earlier, is there an accepted

6   meaning of what "surface waters" means in the insurance

7   industry, the answer to that question is "yes, certainly in

8   Massachusetts."

9          THE COURT:  Well, can I just push you on this a little

03:09 10   bit?  I understand that you think the First Circuit was wrong.

11   I get that, you think that they misconstrued SJC law, but isn't

12   it binding on me?  In other words, isn't your best bet just to

13   take it up with them and say, "You got this wrong, First

14   Circuit"?

15          MR. PAGE:  So I fully expected that your Honor would

16   want to jump right to that.

17          THE COURT:  Like, who am I to say, "Oh, you got the

18   SJC wrong, sorry"?  It's not dicta.  I read the opinion.  A

19   dicta is like a throwaway line or two.  I mean, I will grant

03:10 20   you it was undisputed because they raised it sua sponte, but it

21   wasn't dicta.  They held it.  And they had a paragraph.  It

22   wasn't like a parenthetical or a little side comment.  That's

23   the issue I have.  Even if you have a powerful argument that

24   they went too far in construing SJC law, isn't the best bet

25   just to go to them?

```
 1            MR. PAGE:  So let's talk about whether it was dicta
 2     because I can tell you're obviously --
 3            THE COURT:  Because I'm not going to reverse the First
 4     Circuit.  Let me just say that.  I'm not going to say it was
 5     poorly reasoned.
 6            MR. PAGE:  And I am not asking you to, your Honor --
 7            THE COURT:  They're right down the hall.  You can trot
 8     over there and discuss it with them.  I mean, I get your
 9     argument.  I didn't even think it was necessarily right or
03:10 10     wrong.  It made me think about it.  It's just you put me in a
11     position where you're asking me to reverse the First Circuit
12     and say they were wrong.
13            MR. PAGE:  So let's --
14            THE COURT:  So I'm just --
15            MR. PAGE:  Yes, let's jump right to it, your Honor,
16     because obviously this is the big issue for you to overcome:
17     Are you bound by what the First Circuit held in *Nova*?  And so
18     let's talk about what the First Circuit actually held in *Nova*,
19     okay?  That case is an anomaly and very different from our case
03:11 20     for a variety of reasons.  Most of the reasons why that case is
21     so different and is not binding on you derive from the very,
22     very different policy wording that was at issue in that case.
23     And because of the different policy wording in that case, the
24     issues that the parties had, and the arguments for and against
25     coverage, were also very different.
```

1          The issue in the *Nova* case was not whether or not

2     ponded water on the roof of Fidelity's building was surface

3     water.  No party, not a single party argued that to the

4     District Court in their motions below.  The words "surface

5     water" do not appear in either Fidelity's or Nova's opening

6     briefs in their cross-motions for summary judgment.

7          THE COURT:  Judge Hillman?

8          MR. PAGE:  I'm sorry?  Correct.  I believe it was

9     before Judge Hillman, that's right.  The issue in that case,

03:12 10    your Honor, was about a rain limitation that was in the Nova

11    policy and the way that that rain limitation interacted with

12    other wording in the policy that expressly granted coverage for

13    damage that's caused by overflow of drains, okay?  So damage

14    caused by overflow of drains was expressly covered under that

15    policy, including if that damage was directly or indirectly

16    caused by it, and including if there were other causes of loss

17    that contributed that might be excluded.

18          So the courts would have to decide, how do I reconcile

19    these two competing provisions in the policy?  I've got the

03:12 20    rain limitation, and then I've got another provision that says

21    "but drain overflow is covered."  And so the issue in that case

22    was, which of these is the efficient proximate cause of the

23    loss, okay?

24          In the District Court, Judge Hillman got to that part

25    of the parties' arguments --

1          THE COURT:  Yes, what was the efficient cause?

2          MR. PAGE:  -- and said, "It doesn't matter to me

3    whether drain overflow was the cause of this loss because even

4    if it was, the drain overflow resulted in surface water, and

5    surface water is excluded."

6          That is the first time that surface water and the

7    issue of surface water ever came up in that case when

8    Judge Hillman just raised them on his own, without either party

9    ever having argued that that's what it was.

03:13 10          THE COURT:  He raised it?

11          MR. PAGE:  Right.  So --

12          THE COURT:  But the First Circuit then grabbed the

13    baton, and they have a whole section on surface water.

14          MR. PAGE:  And here's what the issue was about there,

15    right?  So Fidelity notices what Judge Hillman says in the

16    short opinion.  He said, "Wait a minute.  We never said that

17    the water on the roof was surface water, but if it is, there

18    are other provisions in this policy that make clear that damage

19    caused by surface water is covered, not excluded."  And so they

03:14 20    moved for reconsideration before Judge Hillman, and they

21    pointed out those other provisions of the policy.  There were

22    two endorsements in particular, one, the flood endorsement.

23    They said, "Did you miss this?"  And the motion for

24    reconsideration gets denied within the comment, and that is

25    this unusual context for how the appeal came up.

1          So what were the issues on appeal before the First

2    Circuit?  What was the First Circuit asked to decide?  Number

3    one was the efficient proximate cause question:  Does the rain

4    limitation apply to preclude coverage, or is the drain overflow

5    coverage that everybody agrees, drain overflow was a cause

6    here, does that overtake it, and it was the efficient proximate

7    cause?  That was appellate issue number one.

8          Appellate issue number two is whether the District

9    Court had erred, not by finding that the water on the roof was

03:15 10   surface water but whether the District Court -- because nobody

11   disputed that.  The appellate issue two was whether the court

12   had erred by ignoring the policy provisions that said, "If it's

13   surface water, it's covered, not excluded."

14         So what Zurich has described as the two-page analysis

15   in the First Circuit opinion about the surface water question,

16   at first, it was all about whether the argument had been waived

17   and whether they needed to reach it at all.

18         THE COURT:  Right.

19         MR. PAGE:  Right.  Then you get a paragraph that

03:15 20   describes the holdings in *Boazova* and *Surabian*.  Those

21   holdings, basically the import of those for the First Circuit

22   is:  It doesn't matter if the water lands on an artificial

23   surface on the ground or natural dirt.  And I know Zurich has

24   made much of that distinction.  That is not an issue here, your

25   Honor.  It's not anything that we're trying to contest.  It

1    doesn't matter if it's artificial versus, you know, the grass

2    or the dirt.  What matters is that it be on the surface of the

3    earth or the ground as opposed to many hundreds of feet above

4    the door in our case, some 75 to 100 feet.

5          In that paragraph, the one paragraph that addresses

6    this question, describes *Boazova*, then *Surabian*, and then

7    concludes with, "We see no reason to disturb the District

8    Court's finding."  That's really it, right?  That's where the

9    First Circuit says we see no --

03:16 10          THE COURT:  I take your point, but it was not a

11    throwaway dicta line.  I mean, they embraced the issue full on.

12    Even though you're right that it hadn't been disputed so much

13    in the District Court, they quote the SJC cases; they deal with

14    roof water.  They may have been overreading, which is your

15    point, the SJC cases because the SJC cases were patios or

16    parking lots.  They may have sort of extrapolated from it, if

17    you will, but it's not like they're on their own.  I mean, a

18    bunch of courts have gone that way, and then, I agree, a bunch

19    of courts have gone the other way.

03:17 20          MR. PAGE:  There's another reason, your Honor, why

21    it's dicta, okay?  So we've talked about one which --

22          THE COURT:  What do you mean by dicta?

23          MR. PAGE:  Not necessary for the holding of the case

24    or the outcome of the case.

25          THE COURT:  They felt that it was.

1          MR. PAGE:  I'd like to push back on that a little bit,

2     your Honor, okay?  And we need to focus very carefully on the

3     First Circuit opinion and what the actual holding --

4          THE COURT:  The subtitle, it says "surface water."

5          MR. PAGE:  I'm sorry?

6          THE COURT:  I think it has a separate section called

7     "surface water," or something like that, right?

8          MR. PAGE:  That might be -- so "Discussion:  The rain

9     limitation and surface water coverage."

03:17  10          THE COURT:  Yes.

11          MR. PAGE:  Right?  So those are the two appellate

12     issues, and for the first couple of pages after this, the court

13     goes through the arguments that we talked about with the rain

14     limitation and whether either rain or the drain overflow was

15     the efficient proximate cause of the loss.

16          What the court then concludes is that the drain

17     overflow, as everybody agreed, is what caused the water to

18     accumulate and then subsequently infiltrate the building, and

19     so that was the efficient proximate cause of the loss, and the

03:18  20     rain limitation did not withdraw coverage.

21          What the court then says -- and this is in Footnote 2

22     of the opinion -- the majority is explaining its disagreement

23     with the dissent because the dissent thought that it was

24     necessary to determine whether there would have been surface

25     water coverage under the flood endorsement.  The dissent

1    thought that it was necessary to reach that, and that would

2    have been the only basis for coverage here.  The majority

3    disagreed, and what it explains in that footnote and in the

4    paragraphs leading up to it is that it doesn't matter whether

5    the water on the roof was surface water or not.  What would be

6    the import of that at this point?  Because they've already

7    found that the rain limitation doesn't apply, and they've

8    already found that drain overflow coverage does apply.  And

9    they've already found that if the drain overflow coverage

03:19 10    applies, it doesn't matter if there are other causes that

11    contribute to the loss.  So what difference does it make if we

12    characterize this as surface water or not?  The only possible

13    consequence of that is that we would say, you have your full

14    coverage under drain overflow, but even if you didn't, you

15    might also have coverage under the flood endorsement with its

16    separate deductible.  But what the majority said there is, that

17    doesn't matter, right?  The flood endorsement coverage, the

18    possibility that it might also be covered under another

19    provision, doesn't somehow supersede and withdraw the coverage

03:19 20    that you already had for the drain overflow.

21           THE COURT:  Well, they were addressing, you would say,

22    the concurrence or dissent of Judge Kayatta.

23           MR. PAGE:  But the import of that, your Honor, is that

24    once they have decided that the rain limitation does not apply

25    and that the drain overflow coverage does apply, irrespective

1    of other possible causes, nothing else matters after that.

2          THE COURT:  It strikes me, weren't they just meeting

3    the -- I can't remember -- this must have been the portion that

4    was in dissent -- but the portion of the Kayatta opinion that's

5    a separate opinion?

6          MR. PAGE:  I'm sorry.  Say it again.

7          THE COURT:  Maybe I'm wrong about this, but the reason

8    they added that is because Kayatta took a different tact.

9          MR. PAGE:  He did, and --

03:20 10          THE COURT:  And they were meeting that argument in

11    part two under "surface water," right?  Am I reading --

12          MR. PAGE:  You're right.  So let's talk about

13    Judge Kayatta in the dissent for a minute, and this again goes

14    back --

15          THE COURT:  Kayatta who's still there.

16          MR. PAGE:  I'm sorry?  This goes back again to the

17    extremely different policy wording.  So we've talked about the

18    rain limitation.  We've talked about the drain overflow.  We've

19    talked about the flood endorsement.  In addition to the rain

03:20 20    limitation in that policy, you also had what's called a --

21          THE COURT:  Someone just looked like they were poking

22    in.  You're not expecting someone else here, right?  No?  All

23    right.

24          MR. PAGE:  So in addition to the rain limitation in

25    the policy, you had what's called a "water exclusion," okay?

1    The water exclusion excludes coverage for damage caused by --

2    and then there's a list of things.  And the first subset on

3    that list describes flood, surface water, a number of waves,

4    tidal waves, a number of other things, and then it concludes

5    with overflow of drains at the end of this.  I think it's the

6    third subset of it.

7         So in the original policy form, the insurer there had

8    excluded damage caused by rain, and they had belt and

9    suspenders all kinds of other water damage too:  flood, surface

03:21 10   waters, overflowing drain, all of that.

11        THE COURT:  And then there was an addendum that took

12   that back again, right?

13        MR. PAGE:  That's right.  By the way, your Honor, no

14   rain limitation in our policy, no water exclusion in our

15   policy.  None of those things apply here, which is why the

16   issues are so different.

17        So then you get the endorsement that your Honor is

18   describing that added back the drain overflow coverage, and I

19   think there was one other part, I think having to do with

03:22 20   mudslides, not relevant here.  And what the majority says is

21   that when you added back the coverage for drain overflow, you

22   struck the whole part of that water exclusion that applied to

23   it, which meant the "directly or indirectly" and "whether or

24   not in sequence with other contributing causes," all of that

25   comes out, which means that you now have coverage for drain

1    overflow whether it's caused directly or indirectly or in

2    sequence with other causes.

3            Judge Kayatta is looking at that and he's saying:

4    Okay, well, they've stricken the drain overflow, but they

5    didn't strike the surface water part in that first subpart of

6    the water exclusion.  So that surface water exclusion he's

7    saying still applies under the main policy form.  So now the

8    only way that I can get to coverage is if I find that the

9    surface water coverage came back through the flood endorsement.

03:23 10            The majority says, no, that's not the case, that's not

11   the case at all because, yes, maybe the surface water exclusion

12   is still left there in that water exclusion, but the effect of

13   having added back the drain overflow effectively supersedes it,

14   right?  Because it said specifically that you're going to have

15   that drain overflow coverage whether or not the damage is

16   contributed to in any other sequence by any other cause.  So it

17   doesn't matter if surface water contributes; we already know

18   drain overflow is covered no matter what.

19            So that's why it's not actually necessary to move on

03:23 20   to the question of whether there also would have been coverage

21   under the surface water section in the flood endorsement.  I'd

22   be speculating to guess why the court went on and talked about

23   that anyway instead of just ending right there, you know, with

24   the sections leading up to Footnote 2.  I would guess that

25   probably the reason why is simply to clarify that when the

1    District Court said this was surface water and surface water is

2    excluded, that that in fact was not correct, just as a matter

3    of reading the policy, that the policy would have covered

4    damage caused by surface water, not excluded it.

5            THE COURT:  But including surface water on roofs.

6            MR. PAGE:  Well --

7            THE COURT:  That's what some jury said.

8            MR. PAGE:  The majority found no reason to disturb the

9    District Court's finding.  It made that statement without ever

03:24 10   considering the question of whether water that accumulates on a

11   roof actually comports with those two defining characteristics

12   of surface water.

13           THE COURT:  Well, when you say undisputed, fair enough

14   in terms of Judge Hillman, but to the extent that you say it's

15   undisputed, there was a debate among the judges.

16           MR. PAGE:  Not about whether surface water on the

17   roof --

18           THE COURT:  No, but as to -- yes, because

19   Judge Kayatta was saying that we have to think about surface

03:25 20   water separately.

21           MR. PAGE:  But that opinion, if you read his opinion

22   on that, there is no analysis in there of whether water on a

23   roof is both, one, on the surface of the earth, and, two,

24   naturally spreading over the ground.

25           THE COURT:  I see.  So you're saying, yes, it was in

1    play, but it wasn't how you define it?

2           MR. PAGE:  That's right.  There's no consideration --

3           THE COURT:  All right, I understand your position.  I

4    don't want to take the rest of the afternoon.  Okay, thank you.

5    This is helpful.

6           MR. PAGE:  Okay, okay.  Okay, this does actually speak

7    very much to the question of how much import really should be

8    given to that section of the First Circuit's opinion on this,

9    right?  Because the issues in our case -- and this is coming

03:25 10   back to where I started -- the issue in our case from our

11   position is I think relatively straightforward, and it is

12   entirely dependent on following and adhering to the SJC

13   precedent on this issue.  We're looking for guidance on whether

14   rainwater that falls directly on the roof up here, never

15   touches the surface of the earth or the grounds down here,

16   whether rainwater that falls on the roof and then subsequently

17   infiltrates the hospital from above, whether that meets the

18   definition of surface water.

19           What is the definition of surface water?  My brother,

03:26 20   Mr. Menapace, said we've got to follow the plain and ordinary

21   meaning of that according to what the SJC has said.  Here's

22   what the SJC has said every time it defines surface water:

23   "Surface waters lie or flow on the surface of the earth, and

24   they naturally spread over the ground but do not form a part of

25   any natural water course or lake."  Okay, I have read this

1    *Boazova* decision so many times, that that is a direct quote, I

2    promise you, even though I didn't have to look at it.

3            THE COURT:  You spent last night, you know, like,

4    instead of counting sheep --

5            (Laughter.)

6            MR. PAGE:  I have focused on those words on so many

7    occasions, your Honor, and with good reason, because it's from

8    our state's highest court, and they're telling us what the test

9    is for "are these surface waters?"

03:27 10         "On the surface of the earth or the ground, naturally

11   spreading."  The natural spread part, the SJC has emphasized,

12   the parties here agree, that one of the defining characteristics

13   of surface water is that it has the ability --

14           THE COURT:  So if it flowed off the roof but onto the

15   ground instead of into a drain, it would count?

16           MR. PAGE:  Maybe.  The *Martinez* case that my brother

17   has talked about -- I mean, I said "maybe."  For the natural

18   spread part, maybe you could say it meets that.  You still

19   wouldn't be able to say it was on the surface of the earth

03:27 20  before it got there.

21           THE COURT:  You're saying the parapet walls does this

22   in?  Is that what your position is?

23           MR. PAGE:  On the second.  There are two reasons why,

24   right?  We've got two defining characteristics of surface

25   waters.  One is that it has to be on the surface of the earth

1   or the ground, and the other is that it has to be naturally

2   spreading in a diffused state with the ability to move

3   unconstrained, as Zurich has put it, right?  So two parts:

4   We've got to look and see that the rainwater on the roof

5   exhibit those two characteristics, and the undisputed facts

6   from the record are that it has exhibited neither of those

7   characteristics.  It was never on the surface of the earth or

8   the ground, and it was trapped on a fully enclosed roof.

9            This is another picture of the Lorusso building.

03:28  10            THE COURT:  Yes, that was more helpful.  You sent that

11   over yesterday, yes.

12            MR. PAGE:  Right, right.  And you were asking about

13   what a parapet wall looks like, and you can see it here.

14   There's a wall surrounding the surface on all four sides here,

15   right?  There is no ability for water that falls on that roof

16   and starts to accumulate to spread anywhere else except the

17   roof, right?  And you've heard Zurich argue that, well, there's

18   no difference between a roof surface and the ground surface.

19   They even cited to Webster that the ground might include

03:29  20   buildings thereon -- or, no, I think it's that the ground

21   includes any surface on which a person can walk or an object

22   can rest, which basically means any surface at all.  That

23   doesn't help us in terms of construing whether the surface of

24   the earth down here is the same thing up here.  Clearly they

25   are not the same thing, your Honor.  If I'm on top of the roof

1    of the Lorusso building and I step off, I'm going to fall some

2    75 to 100 feet before I reach the surface of the earth or the

3    ground down here, right?  They are not all part of some

4    continuous surface of the globe, you know, if we step back and

5    look.  And Zurich has said that if we don't consider this to be

6    the ground, then we'll eliminate vast swarths of the earth from

7    having any surface of the earth or the ground.  That is

8    absolutely not so.  The building is built on top of the ground.

9    There is ground underneath the building.

03:30 10            THE COURT:  All right, I understand.  I understand.

11            MR. PAGE:  Right?  Okay.  But the point about them not

12    all being a continuous --

13            THE COURT:  The first case, I forget, did that have a

14    parapet wall too?

15            MR. PAGE:  It did, your Honor.

16            THE COURT:  It's just so on all fours, it's a problem

17    for you.

18            MR. PAGE:  It did have a parapet wall.  I would

19    challenge your Honor to look through the First Circuit opinion

03:30 20    and try to find any analysis in there of whether the ability of

21    the water to move and spread --

22            THE COURT:  I mean, I hear your argument, particularly

23    about the diffuse element.  If you were to be completely

24    correct, then all of these people would lose insurance that

25    they thought they had because they thought they had it on the

1    roof.  So then I understand your argument that, well, it's not

2    diffuse because it doesn't flow over the ground because of the

3    parapet, so that's different, this Part B argument.

4         MR. PAGE:  It is.  I'm not sure I understood the point

5    your Honor was making about people losing coverage because they

6    thought --

7         THE COURT:  I mean, they all think, because of the

8    First Circuit opinion, that floods on the roof are covered.

9         MR. PAGE:  Your Honor, this policy is an all-risks

03:31 10   policy.  Damage by all water is covered under this policy.  The

11   only limitation on that coverage is the flood sub-limit.  And

12   so for purposes of our inquiry, we need to ask whether the

13   "flood" definition, for purposes of the applicability of this

14   sub-limit, describes the type of water intrusion that we had

15   here, the type that comes from above through the roof.

16        THE COURT:  Let me ask you this.  As my comments have

17   somewhat indicated, I'm unlikely to reverse the First Circuit

18   or say they're wrong.  And it isn't the kind of dicta that I

19   often say, well, they didn't really mean it when it's like a

03:31 20   footnote, aside, something.  I mean, it was a full discussion

21   and a separate section.  But is this the kind of thing that I

22   should just do an interlocutory appeal where you can ask them

23   to reconsider it?  I mean, I'm not likely to certify it over to

24   the State Court.  I'm not likely to do that.  Or whether I can

25   just grant judgment and have you go up right away rather

than -- you all scared me with the threshold statements about
how much more there was to do in this case, so, I mean, it
could be two or three years more before the First Circuit got
to address the threshold issue.  You can talk about it.  You
can talk about it.  I don't know what you all think.  How much
more time would it be?  In other words, if I granted their
motion and said the First Circuit controls but you have
arguments that go the other way, how much more is there left in
this litigation?  This is why I started there.

03:32 10          MR. PAGE:  Yeah, there's -- I mean, there's a
substantial amount more in this litigation after that.  I think
Mr. Menapace was right in that --

13          THE COURT:  I mean, if you were to tell me it's
basically going to settle hinging on this thing, would it make
sense, just do an interlocutory appeal?  You're saying "no."

16          MR. PENTZ:  To the extent I was showing my thoughts, I
apologize.  Mr. Page is leading the argument, but if the
question is whether --

19          THE COURT:  You can think about it.  I don't want to
03:33 20   put you on the spot.

21          MR. PENTZ:  -- interlocutory appeal would be an
appropriate way to go, particularly your Honor being
disinclined to certify questions to the SJC, my answer would be
"yes."

25          THE COURT:  Well, why don't you think about it and

```
 1    tell me.  What do you think?
 2            MR. PAGE:  I for one standing here, too, also would
 3    not have any issue with that, your Honor.  I mean, I think
 4    essentially --
 5            THE COURT:  Think about it.  I'll let you get back to
 6    me in a week or so.  I'm not going to write it that fast.
 7            What do you think?
 8            MR. MENAPACE:  Your Honor, we assumed that when the
 9    Court applied the First Circuit in Fidelity, that my brother
10    would seek an interlocutory appeal anyway.
11            THE COURT:  Oh, you assumed that.
12            MR. MENAPACE:  I assumed that they would.
13            THE COURT:  Oh, I thought it was a stroke of genius on
14    my part, but anyway -- because I'm not about to certify.  That
15    takes an eternity, and you can't do it every time, as you say,
16    there's a different fact situation.  I mean, essentially what
17    you're arguing is, "Hey, Judges, this wasn't really briefed
18    this way in front of you, and we think you got the SJC law
19    wrong."  Better you say it than me.  I mean, that's essentially
20    what you're saying here.
21            MR. PAGE:  Well, I respectfully disagree, your Honor.
22    It's not what I'm saying.  I'm saying that what the First
23    Circuit was doing with its surface water discussion was
24    describing a different issue.  It was not trying to pass on
25    whether the water on the roof was indeed surface water.
```

1          THE COURT:  All right, all right.

2          MR. PAGE:  All right?  So it was a different issue.

3     Maybe if it was sent directly on up to the First Circuit to ask

4     did this matter --

5          THE COURT:  Well, think about it as an option.  I had

6     thought maybe, if I could grant or deny summary judgment, that

7     would be the end of the case and you could just appeal it

8     anyway, but you're now telling me there's a lot more to go.

9          MR. PAGE:  I know that Steward certainly has, you

03:35 10   know, a substantial way to go in terms of the rest of its

11    business interruption losses.  There's bad-faith claims

12    involved.  There's going to be --

13         THE COURT:  I don't see how it could be bad faith on

14    this particular issue, but there may be other issues that

15    there's bad faith on.

16         I mean, is it a different issue, Mr. Cooper.

17         MR. COOPER:  Yes, but we don't need to address that

18    today, your Honor.  Let me just say, to the extent the idea has

19    been raised, I'm dealing with a hospital that was destroyed,

03:35 20   and the faster we get every issue decided, I'd be all in favor

21    of an interlocutory appeal to the First Circuit to resolve the

22    sub-limitation issue.  I don't think that needs to hold

23    anything else up.

24         THE COURT:  Well, I think it does.  I -- anyway, think

25    about it.  Think how you would do it and let me know.

```
 1    Otherwise, I didn't know if you had more you wanted to discuss
 2    from your point of view?
 3              MR. PAGE:  I mean, I think I would add just one
 4    further point here, and it relates to --
 5              THE COURT:  Well, could you tell me what appellate
 6    court has ruled your way?
 7              MR. PAGE:  Yes, your Honor.  I was going back to the
 8    briefing and circling some of them.
 9              THE COURT:  Any Federal Circuit cases?
10    MR. PAGE:  There was one Federal Circuit, but I think
11    your Honor was noting that that was one that was a Federal --
12              THE COURT:  Unreported?  Yes.
13              MR. PAGE:  There's the highest state court in Iowa,
14    the Louisiana Appellate Court, Georgia Appellate Court, Florida
15    Appellate Court.
16              THE COURT:  So the state appellate courts have split
17    on this, and the SJC really hasn't ruled on it because patios
18    and parking lots are different.  They really haven't ruled on
19    it.
20    MR. PAGE:  They have not addressed a question that
21    involves any kind of surface that is not on the ground.  You're
22    right about that.  What they did do is include in their
23    definition of surface waters "on the surface of the earth and
24    spreading over the ground," which to us we think is pretty darn
25    clear that they mean on the ground.
```

03:36 (line 10)
03:36 (line 20)

1          THE COURT:  They didn't have a roof.

2          MR. PAGE:  They have not addressed a question that

3   involved a roof or even a surface even marginally above the

4   ground.  The SJC hasn't ruled on that, no.

5          THE COURT:  They haven't had that case.

6          MR. PAGE:  In terms of the split, your Honor, you're

7   right that there is a split.  There are courts from other

8   jurisdictions that have gone in Zurich's favor.  I think

9   they've cited four from four other jurisdictions.  We've cited

03:37  10   ten from seven.  So if your Honor is looking for a majority

11   view —— I know that's not the way that you're —— in deciding

12   the case, the majority view favors MPT's positions, not

13   Zurich's.

14          You asked me if there was anything else that I wanted

15   to say.  There's one other thing I'd like to say, and that is

16   to refocus ourselves on who has the burden here and what that

17   burden is in terms of proving that this flood sub-limit

18   applies.  The flood sub-limit in the policy is an exclusionary

19   provision.  It's not like in *Nova* which was coverage-granting.

03:38  20   This is an exclusionary provision.  It limits the amount of

21   coverage that is available to MPT.

22          Like I was saying before, this is an all-risks policy.

23   There are no exclusions that pull back on damage caused by

24   water.  There certainly could have been, your Honor.  Zurich

25   knew how to write an exclusion that would apply to damage

1  caused by rain.  In fact, they included a limitation --

2          THE COURT:  Can you show me where it says "exclusion"?

3          MR. PAGE:  It's a sub-limit, so I'm saying it's

4  exclusionary, right?  It limits the coverage available.  But

5  for this sub-limit, all of MPT's losses caused by any of the

6  water would be covered.

7          THE COURT:  They treat sub-limits as exclusionary

8  clauses?

9          MR. PAGE:  They do, your Honor.

03:38 10          THE COURT:  Okay.

11          MR. PAGE:  I'm afraid I don't have a case citation for

12  you on hand, although I'm pretty sure there is one in the

13  briefs, if you want to go back and find it.

14          So this is an exclusionary provision, which means that

15  it is Zurich's burden to prove that it clearly and unambiguously

16  applies to the facts of this case.  Its interpretation of how

17  this flood sub-limit applies for the rainwater up here has to

18  be the only reasonable one.  If MPT's position is a reasonable

19  interpretation of how the policy wording applies, then it's

03:39 20  ambiguous, and Massachusetts law is clear that ambiguities are

21  resolved in favor of the policyholder.

22          THE COURT:  When I'm deciding that issue about whether

23  it's the only reasonable interpretation, don't I take into

24  account existing case law?

25          MR. PAGE:  Well, certainly so, yes.  And I would say

 1   that the split of courts that have looked at this issue,

 2   whether water on a roof can be surface water, and come out in

 3   different ways, would suggest that there might be more than one

 4   reasonable interpretation, and that potentially there is an

 5   ambiguity here.  In fact, there is an SJC case just a couple of

 6   years ago -- I think it's *Dorchester v. Krusell*, I want to

 7   say -- that said exactly that.  It was construing the term of

 8   "use" in an insurance policy, and it said, "Look, the fact that

 9   different courts in different jurisdictions have construed this

03:40 10   word differently seems to me like evidence of ambiguity; I need

11   to construe it in favor of the policyholder."  So that's one

12   piece of evidence.

13          Another piece of evidence that your Honor seized on

14   when my brother, Mr. Menapace, was talking is the fact that

15   MPT's position in this case is the position that Zurich took.

16   It is literally Zurich's original interpretation of how its

17   flood sub-limit applied.  It said that the water that came in

18   on the basement and the ground floor, the water that we saw

19   here in that picture that's accumulated there and came rushing

03:40 20   in, that's flood.  We agree with that, that's flood.  But the

21   water damage sustained on the upper floors that resulted from

22   water caused by rain that overflowed the roof drains and came

23   in through, you know, roof vulnerability -- it's like the

24   parapet flashing -- that's different.  That's not flood.  And

25   Zurich plans to separate the flood damage sustained on the

1    basement and ground floors from the rain damage on the upper

2    floors.  That's a coverage position, your Honor.  That's not a

3    factual finding; that's a coverage position.  They're saying

4    those are two different causes of loss.  So the fact that our

5    interpret- --

6              THE COURT:  So what significance do you say I give to

7    that?  I mean, I don't know that it -- wasn't there a

8    reservation of rights or something in that letter?

9              MR. PAGE:  We're not arguing that it created a waiver

03:41 10   or an estoppel.  He's right that that is not part of our

11   argument.  The significance is that it is strong evidence of

12   the reasonableness of MPT's position here.

13             THE COURT:  Okay, thank you.

14             MR. PAGE:  His position is the same one they took.

15             THE COURT:  All right, thank you.  I just want to make

16   sure I have time for Mr. Cooper.

17             MR. PAGE:  Sure.  Thank you, your Honor.

18             THE COURT:  Thank you very much.

19             Mr. Cooper, you wanted something completely different,

03:42 20   right?  You had a different point?

21             MR. COOPER:  I just want to add some things, a couple

22   of narrow points from Steward's perspective, your Honor.

23   First, with regard to the idea that your Honor surfaced -- a

24   bad word to choose, I suppose -- with regard to --

25             THE COURT:  A good pun.

1          MR. COOPER:  -- an interlocutory appeal, I would just

2     remind the Court that the Steward case is separate.  The

3     bad-faith claim is separate.  These are two distinct lawsuits.

4     And what I was communicating is, the Steward case could

5     proceed, which is where the bad-faith claim is, and --

6          THE COURT:  Can you tell me what the bad faith is?

7          MR. COOPER:  Your Honor, starting with the reversal of

8     the coverage position that Zurich, AGLIC -- I'm going to refer

9     to them as Zurich, it's just easier to say -- engaged in --

03:42 10        THE COURT:  You mean this -- well, I don't know.

11         MR. COOPER:  Let me start with the point that I want

12    to emphasize from Steward's perspective, your Honor.  When you

13    go back to think this decision through and you are considering --

14    your Honor asked about, "Don't I take into account the case

15    law?"  When you are considering the language of the policy, the

16    beginning and the end of the analysis here should be, what does

17    the plain language of the policy suggest?

18         THE COURT:  Right, I hear you.

19         MR. COOPER:  In that regard, your Honor, and as

03:43 20    Mr. Page said, if there are two reasonable explanations, the

21    one that benefits the insured is the one that rules, and that

22    is a basic proposition of Massachusetts law.  I would ask you

23    to look at Exhibit 3 to Steward's appendix in support of our

24    cross-motion for summary judgment.  Mr. Menapace described and

25    told you, in response to a question that you asked about

1   whether Zurich had changed its coverage position, he said,

2   "There was no coverage position.  This was a preliminary

3   letter.  It doesn't mean anything."  Read the letter, your

4   Honor.  Not so.

5        When this flood event took place in June, my client,

6   as I said, had to literally evacuate dozens of patients and

7   find them other places to go in the middle of the night with

8   all sorts of emergency crews.  The Town of Norwood issued a

9   cease and desist order, shut the hospital down.  It hasn't been

03:44 10   open since.  We were in the middle of the pandemic, your Honor,

11   and to say that this was a crisis would be an understatement.

12        My client as a result brought in every expert,

13   including insurance experts, legal counsel, myself, and

14   immediately, as did Zurich, about six weeks after this

15   devastating event, when a preliminary inspection of the

16   building had been undertaken and everybody understood basically

17   what a serious situation this was, the Governor had weighed in,

18   et cetera, Zurich didn't send some note from a claims adjuster.

19   A senior executive who has run this claim from the beginning

03:45 20   named Mark Graves sent a coverage letter to my client.  This is

21   Exhibit 3.  It's dated August 6.  It says, "Here is the

22   position after an initial review of the coverage," and it

23   recognized that under this policy, two things:  First, absent

24   this flood limitation, my client has $850 million worth of

25   insurance.  And I'm telling you, your Honor, on the business

1   interruption and the destroyed equipment, the loan, the

2   diagnostic equipment, the supplies, et cetera, my client is

3   already $70 million over the flood sub-limit.  But before

4   anybody knew this, what they said was, and I'm quoting here,

5   and they do say, "Although the investigation is ongoing --"

6            THE COURT:  Do they have a reservation of rights?

7            MR. COOPER:  It's not a reservation of rights, your

8   Honor.  At the very end they say -- well, they do say at the

9   end that they "reserve the right, as the investigation

03:46 10   warrants, to claim that the loss or a portion of the loss

11   asserted by you is or is not covered."

12            THE COURT:  Right.

13            MR. COOPER:  So I understand that.  But, your Honor,

14   you asked about the plain meaning of the policy and the

15   interpretations.  It is significant here that Zurich's own

16   considered interpretation of the language of this policy was

17   that the flood sub-limit applied only to the basement and the

18   ground floor and that it did not apply to any of the elements

19   above that.  And from my client's perspective, that is hugely

03:46 20   significant --

21            THE COURT:  Is that the bad faith you're alleging?

22            MR. COOPER:  Well, no, your Honor.  My client has a

23   time element claim, a business interruption claim, and it has a

24   lost equipment claim, et cetera.

25            THE COURT:  So are you getting paid for that?

1          MR. COOPER:  Partially, partially.

2          THE COURT:  Is that the basis -- I'm just trying to

3    figure out if I -- listen, I understand you feel -- the letter

4    thing, no one has raised waiver or estoppel, and there's a

5    reservation of rights, and I understand the frustration, they

6    flip-flopped --

7          MR. COOPER:  It's not a matter --

8          THE COURT:  -- but I want to get to whether or not if

9    I granted an interlocutory appeal, I can let your other

03:47 10   bad-faith claims proceed.  So I understand the rhetoric, but I

11   want to understand, in essence, what are your other bad-faith

12   claims, and can that proceed in tandem if I allowed an

13   interlocutory appeal?

14         MR. COOPER:  Well, I'd have to -- in terms of

15   discovery, et cetera, your Honor, I would want to talk to

16   opposing counsel to figure that out.

17         THE COURT:  Yes, of course.

18         MR. COOPER:  And we will do that.  But I want to be

19   clear that my point in raising this letter isn't to argue a

03:47 20   waiver or estoppel, at least not today.  It is to offer you

21   Zurich's own coverage position as to the meaning of that

22   language in the policy, including surface water and flood

23   sub-limits.  This is their own interpretation of their own

24   policy, your Honor.

25         THE COURT:  Thank you.  I know that.  I've had it up

1  there.  But what is the bad faith?  Can your bad-faith claims

2  proceed in tandem? -- I know you want to think about it --

3  while I put this legal question, if you all agree that an

4  interlocutory appeal is appropriate?

5       MR. COOPER:  Well, put it this way, your Honor:  I

6  think that the sub-limit issue is sufficiently important that I

7  would be in favor of that proceeding regardless of the

8  consequences to having to do other things.  There are aspects

9  of this that are going to proceed, presumably pursuant to the

03:48 10  insurance policy, in an appraisal or referee format over the

11  particular items --

12       THE COURT:  I see, I see.

13       MR. COOPER:  So my only point was, here are things we

14  could be doing.  But I agree with MPT's counsel that getting

15  this issue of the sub-limit resolved is critical because

16  vis-a-vis my client, Zurich is relying on --

17       Bless you, your Honor.

18       THE COURT:  Excuse me.  I'm sorry.  I feel fine.

19       (Laughter.)

03:49 20       MR. COOPER:  It would be extremely meaningful, given

21  the numbers that we're already at, if the parties were to learn

22  that Zurich can't take advantage of the flood sub-limit with

23  regard to a substantial portion of my client's claim.

24       THE COURT:  I understand.  Okay, so can you get back

25  to me, let's say by Labor Day?  You all talk, you figure it

1      out, whether this makes sense.

2            MR. PENTZ:  The proposal for an interlocutory appeal?

3            THE COURT:  Yes.

4            MR. PENTZ:  Yes.

5            THE COURT:  It may not.  It may be that I should write

6      a whole opinion and then proceed on the rest of it.  But from

7      the way you're talking, the rest of it could take another year

8      or two, right, whichever way I go?

9            MR. COOPER:  Your Honor, the hesitation you're hearing

03:50 10   is, I don't know that there's even agreement yet in what forum

11     some of these things are going to be litigated.

12            THE COURT:  Oh, I see.

13            MR. COOPER:  But I do think that there would be

14     agreement, and it was the motivation for doing these

15     cross-motions early, on getting the sub-limit resolved

16     because --

17            THE COURT:  Yes, it does make sense.  I mean, at

18     first, you know, we were looking at it and we're thinking

19     $100,000, and then we looked, "Whoa, there are three more zeros

03:50 20   here."  So there's a lot of money involved, and it's a lot of

21     money in loss, a lot of money at stake.  And it may be that you

22     all think that that's a good approach or not, so can you get

23     back to me, let's say by Labor Day?

24            MR. MENAPACE:  Yes, your Honor.

25            THE CLERK:  Tuesday, the 6th of September, that's the

1    day after Labor Day.

2         THE COURT:  And just remind me because I'm embarrassed

3    to say I'm not a hundred percent sure I know this one:  If I

4    certify on interlocutory appeal, I think I still have to rule.

5    I can't just say, "Gee, this is an interesting issue, First

6    Circuit.  Take a look at it."

7         MR. MENAPACE:  I believe that's correct, your Honor.

8         THE COURT:  I still have to write something, so, I

9    mean, I'll proceed to write something.  And meanwhile I think

03:51 10   the money is so high and the stakes so high that it just may

11   make sense to have them look at it.

12         I will have to tell you that I'm not sure what's the

13   quicker route because for those of you who litigate, I mean, it

14   could take a year anyway to get an answer from them on their

15   briefing schedule.  So I would be open to having some other

16   issues moving in tandem so we don't lose the year.  So think

17   about it, let me know.

18         And let me just say, I'm making an assumption here

19   that this case can't settle till this legal question gets

03:51 20   resolved.  Is that right?  Or am I just --

21         MR. COOPER:  I think that's a safe assumption, and I

22   would only add, your Honor, it's not like we haven't tried.

23   All parties, we've tried.

24         MR. PENTZ:  Yes, your Honor, there's already been a

25   mediation in this case.  There's been a great deal of effort to

1    settle it without the --

2            THE COURT:  Who was the mediator?

3            MR. PENTZ:  That was Larry Pollack from JAMS,

4    New York.

5            THE COURT:  Oh, the judge?  No.  That's Sydney

6    Pollack.

7            MR. PENTZ:  Yes, Larry Pollack.

8            THE COURT:  So is it worth another stab right now at

9    trying to mediate it?

03:52 10           MR. PENTZ:  I don't think that there would be enough

11    of a change of the scene to cause a settlement now.  I think

12    proceeding perhaps as your Honor has suggested is the way we

13    need to go.

14            THE COURT:  Thank you.  Ironically, you may be in a

15    situation -- I recently have seen a few cases that went to the

16    First Circuit.  The First Circuit then certified to the State

17    Court, and they were three years down the road.  What can I do?

18            MR. PAGE:  With, you know, $120 million to

19    $150 million at stake, that may be worthwhile.

03:52 20           THE COURT:  It may be worth it, because it's state

21    law, right, and you have the 12 percent interest rate?

22            Okay, sounds good.  Have a wonderful summer.  Let me

23    know by Labor Day what you want me to do.  Ideally, there will

24    be an agreed-upon, but if not, just cross-motions.

25            Okay, thank you very much.

1          MR. MENAPACE:  Thank you, your Honor.

2          MR. PAGE:  Thank you, your Honor.

3          MR. PENTZ:  Thank you, your Honor.

4          (Adjourned, 3:53 p.m.)

5                    C E R T I F I C A T E

6

7

UNITED STATES DISTRICT COURT )
8   DISTRICT OF MASSACHUSETTS    ) ss.
    CITY OF BOSTON               )
9

10

11          I, Lee A. Marzilli, Official Federal Court Reporter,

12   do hereby certify that the foregoing transcript, Pages 1

13   through 59 inclusive, was recorded by me stenographically at

14   the time and place aforesaid in Civil Action No. 21-11621-PBS,

15   Zurich American Insurance Company v. Medical Properties Trust,

16   Inc., and thereafter by me reduced to typewriting and is a true

17   and accurate record of the proceedings.

18          Dated this 26th day of August, 2022.

19

20

21

22

23          /s/ Lee A. Marzilli
            _____
24          LEE A. MARZILLI, CRR
            OFFICIAL COURT REPORTER
25